UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                **REPORT,
RECOMMENDATION
AND ORDER**

v.

                                               22-CR-0053(JLS)(JJM)

JAMES P. FOX,

                          Defendant.
_____

        Defendant James Fox is charged (along with a co-defendant) in a 13-count

Superseding Indictment [48][1] with drug and sex trafficking crimes.  These charges arise out of

the execution of a search warrant at Fox's residence in the early morning hours of February 3,

2022, that was followed by a recorded interview of Fox and polygraph examination at the

Lancaster Police Department ("LPD").  Before the court are the remaining portions of Fox's

motion [94], seeking suppression of evidence and statements obtained on February 3, 2022, and

for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (Fox's Memorandum of Law

[94-2], §§VI and VII),[2] as well as the government's cross-motion for reciprocal discovery. *See*

Government's Response [104] at 53.

        An evidentiary hearing was held before me on April 26, 2023 [123] concerning

the events of February 3, 2022, from the time of the execution of the search warrant through the

_____

[1]        Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF
pagination.

[2]        At the March 13, 2023 oral argument, Fox agreed that all other portions of his pretrial motion
[94] have been resolved. *See* March 14, 2023 Text Order [107].

commencement of Fox's recorded interview at the LPD.[3] At the hearing, I heard testimony from Homeland Security Investigations ("HSI") Special Agents ("SAs") Matthew Mastrorilli, William Gamble, Jerrod Kremblas, and Patricia Calleri, as well as Cheektowaga Police Department Lieutenant Garrett Slawatycki. Thereafter, the parties filed post-hearing submissions [132-35].

Having considered the parties' briefing [94, 104-05, 132-35], the hearing transcript [123] and exhibits [118, 142], and heard oral argument on March 13 and July 28, 2023 [107, 141], for the following reasons, the government's cross-motion is granted, and I recommend that Fox's motions be denied.

## BACKGROUND

On February 3, 2022 at approximately 6:00 a.m., a search warrant signed by Magistrate Judge Michael J. Roemer (22-mj-5005 ([104-1] at 2-39)) was executed at Fox's residence, a two-story duplex located at 981 Beach Road in Cheektowaga, New York. April 26, 2023 hearing transcript [123] at 213. Because of information that Fox "was known to be paranoid and pace the house with [a] shotgun while staring out the front window", the HSI Special Response Team ("SRT") participated in the search. Id. at 209-10. Approximately ten members of the SRT arrived at the residence in a tactical vehicle known as a "BearCat". Id. at 57-58, 64, 138, 161; gov. exs. 8A-F [118-24].

---

[3]      Fox also moves to suppress the statements he made at the LPD, but since that interview and all of the relevant events were recorded (manually filed exhibit to [104]), it was not part of the hearing. The government's reliance on the inevitable discovery doctrine (government's Response [104] at 38-41), was also not within the scope of the hearing. *See* March 14, 2023 Text Order [107].

Law enforcement entered the residence in tactical gear with their firearms drawn shouting commands.[4]  They escorted Fox and co-defendant Rachel Dellavalle out of the residence.  While exiting the residence, Fox asked something to effect of "we're going outside?", and was told "to shut the f_ck up". [123] at 113-14.

At that time, the temperature was 27 degrees Fahrenheit, there was snow on the ground, and the wind was blowing at 10 mph. Id. at 114, 116; gov. ex. 14 [118-22] at 2.  Despite the weather conditions, Fox was brought out of the residence wearing only his boxer shorts, and walked to the rear of the BearCat in handcuffs and bare feet. [123] at 16-17, 79, 81-82, 114.  The rear door of the BearCat remained opened to allow SAs Kremblas and Mastrorilli to observe Fox and Dellavalle. Id. at 18, 34, 177-78.  Despite the cold temperature and wind, which may have been blowing into the open door of the BearCat, the rear of the vehicle had heat that was on during the ride to Fox's residence and remained on while Fox and Dellavalle were seated in the vehicle. Id. at 21, 58, 65-66, 137-38, 142-43, 162-64, 166, 168, 177.

Although Fox did not ask for clothing or anything else to stay warm, SA Kremblas observed that Fox was "shivering a little bit" while seated in the rear of the BearCat, so he retrieved his jacket and draped it over Fox's shoulders. Id. at 28, 171-72.  SA Kremblas could not recall whether the jacket remained on Fox's shoulders, but SA Mastrorilli did not observe it fall off. Id. at 28, 173.

Fox and Dellavalle remained in the rear of the BearCat for approximately 20 to 25 minutes while law enforcement cleared the residence for people and weapons. Id. at 83-84,

---

[4]    Portions of the search warrant execution were captured on a surveillance camera inside the residence (gov. ex. 10 (manually filed)) and a body camera (gov. ex. 15 (manually filed)).

87-88, 103, 125-26. *But see* id. at 181 (estimating 15 minutes).  According to SA Gamble, they were not free to leave until the residence was cleared. Id. at 119.

When the house was cleared, SA Kremblas escorted Fox back into the residence, where he was taken to room G (*see* gov. Ex. 7 [118-8]), the living room of the unoccupied rental unit,[5] which was heated. [123] at 88-89, 181-82, 219, 222, 226-227, 280. Shortly after, Fox was given a blanket to "make him appear decent" and seated on a couch.  SA Calleri retrieved his sweatpants and a sweatshirt, which he put on in front of law enforcement. Id. at 89-90, 144-45, 227, 228-30, 238.  At some point before putting on his clothes, Fox's handcuffs were removed and they remained off during the balance of his encounter with SA Calleri. Id. at 89, 145-46, 155, 227.  Fox did not complain of being cold and did not appear to be. Id. at 238.

Before any substantive conversation with Fox began, SA Gamble informed SA Calleri that they had located a gun safe that would need to be breached. Id. at 231-32. Overhearing that conversation, Fox interjected that the key to the safe was in the kitchen drawer and asked them "not to break open the safe". Id. at 90-91, 106-07, 146-47, 232-33, 263.  When the key was located, Fox was asked to confirm that it was the correct key. Id. at 233, 264.

At or about the same time, SA Calleri asked Fox where his cell phone was located, and he told her that it was on the table next to the couch in his apartment. Id. at 234. SA Calleri retrieved the phone and brought it back to Fox, who confirmed that it was his phone and, at SA Calleri's request, provided its pass code. Id. at 235-36.  SA Calleri used the pass code to

---

[5] Fox owned the entire duplex, which consisted of his apartment and an adjacent rental unit. *See* Fox Declaration [95], ¶3.

open the phone in Fox's presence, placed it in airplane mode to prevent tampering, and returned it to the table where it was located for later evidence collection. Id. at 236-37.

SA Calleri did not raise her voice to Fox or make any threats or promises to him during their conversation. Id. at 238-39, 241. Other officers came and went during their conversation, but none stood over him, surrounded him, yelled, raised their voices, or pointed weapons at him. Id. at 245. SA Calleri testified that she "did not have any intention of arresting" Fox, and that he was free to leave. Id. at 94, 259. However, during the conversation, Fox was not told that he was free to leave, nor did he ask to leave. Id. at 92-93, 119, 239-41, 258. SA Calleri further testified that Fox was not allowed to get his own clothes and get dressed outside of the presence of law enforcement, because "we need to maintain the integrity of the premises . . . and allowing roaming of th[e] house would essentially jeopardize that integrity". Id. at 260.

Toward the end of SA Calleri's approximately 20-minute conversation with Fox, he asked "what the search warrant was about", to which she responded, "we are going to talk about that in a little bit, in a few minutes, at the [LPD]". Id. at 241-42, 244-45. Since SA Calleri's partner was LPD Detective Robert Cornell and the LPD had a "nice facility" with audio and video capabilities, the interview was continued at the LPD. Id. at 206-07, 241-42. SA Calleri also had a polygraph examiner on stand-by. Id. at 242.

A marked police vehicle operated by Cheektowaga Police Officer Joshua Donovan transported Fox to the LPD. Id. at 243. Because of Cheektowaga Police Department requirements, Fox was handcuffed while transported to the LPD. Id. at 243-44.[6]

---

[6]    Fox's counsel acknowledged during oral argument that Fox made no incriminating statements during the ride to the LPD.

-5-

At the LPD, a recorded interview ([104], Exhibit 2) was conducted after Fox was informed of his <u>Miranda</u> rights and signed a waiver ([104-1] at 42).  After questioning by SA Thomas Weiss and Detective Cornell, he then consented to a polygraph examination and signed another <u>Miranda</u> waiver (<u>id</u>. at 53) and polygraph consent form. <u>Id</u>. at 55.

Fox contends that at the conclusion of the polygraph examination, he was placed in handcuffs and shackles and transported back to his residence and told to "stay in Erie County". Fox Declaration [95], ¶8.  When officers returned to his residence a few hours later, he was arrested and brought to Niagara County Jail. <u>Id</u>.

## DISCUSSION

A.    **Fox's Motions**

1.    **Suppression of Statements while in the Residence**

Fox argues that he was in custody during this portion of the encounter, and therefore <u>Miranda</u> warnings were required before he was questioned. Fox's Post Hearing Brief [133] at 22-33. He acknowledges that "[v]iolations of the <u>Miranda</u> rule do not ordinarily lead to the exclusion of physical evidence derived from an unwarned, yet voluntary statement", but contends that the derivative evidence here must be suppressed because his statements were coerced. <u>Id</u>. at 35 (*citing* <u>United States v. Patane</u>, 542 U.S. 630, 636 (2004)).

Resolution of these issues turns, in part, on the credibility of the witnesses. *See* <u>United States v. Bayless</u>, 921 F.Supp. 211, 213 (S.D.N.Y. 1996).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited." <u>Krist v. Kolombos Rest. Inc.</u>, 688 F.3d 89, 95 (2d Cir. 2012). In establishing his entitlement to an

evidentiary hearing, Fox submitted a Declaration that gave a very different version of events from the testimony elicited at the evidentiary hearing. For instance, he states that there was no heat in the BearCat, that he was told to give law enforcement the keys to the safe and the pass code to his phone or they would break into them, and that he was only uncuffed to get dressed, but otherwise remained in both handcuffs and shackles from the time of his initial encounter with law enforcement through his transport to the LPD. Fox Declaration [95], ¶¶5-7. However, he elected not to testify at the evidentiary hearing.

The video evidence in this case makes me very skeptical of Fox's claims of being shackled. While not all of the videos and images are clear, Government Exhibit 13 (Axon Fleet 2IR at 1:14:15 and 1:14:20) plainly shows that Fox was *not* in shackles when he exited Officer Donovan's vehicle at the LPD, which directly refutes Fox's claim that he was shackled (*see* Fox Declaration [95], ¶7), he [LPD]"), and makes me doubt everything in his Declaration. *See* United States v. Rogers, 2000 WL 101235, *8 (S.D.N.Y. 2000), aff'd, 225 F.3d 647 (2d Cir. 2000) (Summary Order) (declining to credit the defendant's testimony "under the doctrine of *falsus in unum, falsus in omnium*"); United States v. Weinstein, 452 F.2d 704, 713 (2d Cir. 1971) ("disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements").

Moreover, since I could not evaluate Fox's credibility through his live testimony, I give far less weight to his Declaration than I do to the live testimony of the government's witnesses, whom I find to be credible. *See* United States v. Murray, 2015 WL 7871358, *4 (W.D.N.Y. 2015) ("courts give greater weight to witness testimony, which was subject to cross

examination, than to sworn affidavits"); United States v. Walker, 2021 WL 1725513, *5
(W.D.N.Y.), adopted, 2021 WL 1723159 (W.D.N.Y. 2021) (declining to credit statements in an
affidavit which contradicted the officer's sworn hearing testimony because the "[t]he live,
credible testimony, which was subject to cross-examination, plainly differs from Ivey's
assertions to the contrary"); United States v. Cherry, 2021 WL 2206969, *13 (S.D.N.Y. 2021)
(same); United States v. Diaz, 2020 WL 6083404, *7 (S.D.N.Y. 2020) (same).

### a.    Fox was Not in Custody

"Miranda's warning requirements apply only to 'custodial interrogation.'" United
States v. Newton, 369 F.3d 659, 669 (2d Cir. 2004).  Where, as here, the "defendant alleges that
a statement was obtained in violation of Miranda, the government bears the burden of proving,
by a preponderance of the evidence . . . that Miranda does not apply because the statement was
not obtained during custodial interrogation". United States v. Zaleski, 559 F. Supp. 2d 178, 188
(D. Conn. 2008).

"The test for determining custody is an objective inquiry that asks (1) whether a
reasonable person would have thought he was free to leave the police encounter at issue and (2)
whether a reasonable person would have understood his freedom of action to have been curtailed
to a degree associated with formal arrest." United States v. Faux, 828 F.3d 130, 135 (2d Cir.
2016).  While Fox may not have felt that he was free to leave under the circumstances, "[t]he
free-to-leave inquiry" is not determinative. Newton, 369 F.3d at 670. The critical issue for
determining if person was in custody for Miranda purposes is "whether a reasonable person
would have understood his freedom of action to have been curtailed to a degree associated with

formal arrest". <u>United States v. Jabar</u>, 19 F.4th 66, 83 (2d Cir. 2021). *See also* <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969) ("in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so"); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) ("the safeguards prescribed by <u>Miranda</u> become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest").

"Relevant considerations include: (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." <u>Jabar</u>, 19 F.4th at 83.

This presents a close question. Some circumstances certainly favor Fox, including the fact that he was not told that he was free to leave, but this is not dispositive. *See* <u>United States v. Akapo</u>, 2009 WL 10676457, *3 (E.D.N.Y. 2009), <u>aff'd</u>, 420 F. App'x 42 (2d Cir. 2011) ("[a]lthough the agents in the instant case did not inform the defendant that he was not under arrest or that he could ask the agents to leave at any time . . . this fact does not render the agents' questioning custodial"). Viewing the totality of the circumstances encountered by Fox when he was questioned inside his residence, I conclude that he was not in custody.

Much of Fox's argument focuses on his removal from the residence and placement into the BearCat. However, law enforcement officers are granted limited authority to

detain occupants of the premises while the search is completed. *See* <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981).

In any event, even if Fox's initial detention in the BearCat rose to the level of a formal arrest, it is undisputed that no interrogation occurred at that time. Moreover, the elements that arguably rendered that portion of the encounter custodial had dissipated by the time of his questioning inside of the residence. *See* <u>United States v. Clark</u>, 600 F. Supp. 3d 251, 268-69 (W.D.N.Y. 2022) ("the custodial nature of the SWAT team's entry had dissipated by the time Defendant decided to remain at her residence and to speak with [law enforcement]").

While Fox was initially handcuffed, which the government acknowledges is "'a hallmark of a formal arrest'" (government's Post-Hearing Memorandum [132] at 8, *quoting* <u>Newton</u>, 369 F.3d at 676), that "cannot establish a state of custody for the duration of his interactions with the police". <u>United States v. Familetti</u>, 878 F.3d 53, 61 (2d Cir. 2017). *See also* <u>United States v. Clark</u>, 600 F. Supp. 3d 251, 266 (W.D.N.Y. 2022) ("the fact that handcuffs were initially used for officer safety purposes upon execution of the search warrant, does not determine custody status at the time of a later interview if the handcuffs have been removed").

The same holds true for law enforcement's initial show of force in securing Fox and Dellavalle and escorting them to the BearCat while the house was cleared. *See* <u>United States v. Simmonds</u>, 641 F. App'x 99, 102 (2d Cir. 2016) (Summary Order) ("[a]lthough the use of firearms is generally an important factor in our analysis of the totality of the circumstances, the fact that the officers initially used firearms and briefly searched Simmonds does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was

necessitated by the officers' safety concerns and ended as soon as the perceived security threat abated").

When Fox was ultimately interrogated, the questioning lasted for only approximately 20 minutes and occurred in the familiar surroundings of his home, which "absent an arrest . . . is generally not deemed custodial". Newton, 369 F.3d at 675. During Fox's questioning, voices were not raised, weapons not brandished, he was not physically restrained in any way, and he did not ask to leave. [123] at 92-94, 239-241.

Although there were clearly a number of law enforcement officers in the residence while he was being questioned, the search warrant was simultaneously being executed and none of these officers surrounded or stood over him. [123] at 245. Under these circumstances, "the presence of the agents in [a defendant's] dwelling . . . does not render . . . questioning custodial." Familetti, 878 F.3d at 610-62. The fact that Fox was not permitted to retrieve his own clothes or dress privately also did not convert this to a custodial situation. "A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other hallmarks of custody) freedom of action is not being curtailed 'to a degree associated with formal arrest.'" Faux, 828 F.3d at 137.

At oral argument Fox's attorney argued that that all circumstances up to and including the time of Fox's formal arrest at his home later that day should be considered in determining whether he was in custody at the time of his statements. However, "in conducting the Miranda analysis, [the court] focus[es] on the time that the relevant statements were made", not on what transpired thereafter. United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016). *See*

*also* United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) ("[o]ur main focus must be

on the individual's restraint *during the interview*") (emphasis in original).  Moreover, even if

law enforcement planned from the outset of the encounter to arrest Fox later that day, "[a]

policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody'

at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position

would have understood his situation." Berkemer, 468 U.S. at 442.

        Therefore, I conclude that the government has met its burden of establishing by a

preponderance of the evidence that Miranda warnings were not required for the questioning that

occurred inside the residence.


        **b.       Fox's Statements were Voluntary**

        Since I have concluded that no Miranda violation occurred, Fox's argument that

the derivative evidence from his coerced statements must be suppressed is moot.  However, as

the government recognizes, "[s]eparate and apart from . . . Miranda, . . . due process forbids the

use at trial of a statement that has been obtained from a defendant by coercion". Government's

Post-Hearing Memorandum [132] at 11.

        "The government bears the burden of demonstrating by a preponderance of the

evidence that a defendant's statement was voluntary." United States v. Wilson, 567 F. Supp. 3d

398, 402 (W.D.N.Y. 2021).  "The overall inquiry into whether a statement was voluntarily given

is to consider the totality of the circumstances of the interview to determine if the accused's will

was somehow overborne by the agent's coercive conduct." United States v. Sun, 571 F. Supp. 3d

22, 31 (W.D.N.Y. 2021). *See also* United States v. Connelly, 2007 WL 3124538, *8 (W.D.N.Y.

2007) ("[a] statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne"). "In applying the totality of the circumstances test, those factors that a court should consider . . . center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988).

As the photograph taken of Fox's face while he was seated in the BearCat demonstrates (*see* Def. ex. A [142-1]), clearly he was shocked by the early morning intrusion into his home, and it was doubtless unpleasant to walk barefoot through the snow without any shoes, pants or shirt and remain in the BearCat for 20 to 25 minutes while the residence was cleared. However, I conclude that the totality of the circumstances establish that Fox's subsequent statements in the residence were not the product of his will being overborne.

Without condoning law enforcement's decision to remove Fox from his home in sub-freezing temperatures in only his underwear, there is no evidence to support his theory that this was a "tactic employed by officers to 'freeze' [him] into submission" or that any such strategy was successful, either physically or psychologically, in overbearing his will. Fox's Post Hearing Brief [133] at 39. As the government noted at oral argument, had their purpose been to freeze Fox into a confession, they would not have taken steps to keep him warm, including removing him from the elements and placing him the rear of the heated BearCat, placing a jacket on him when he was observed to be cold, and questioning him in the residence after being given clothes and a blanket. Nor is there any evidence that Fox ever complained of being cold or appeared cold when in the residence. [123] at 92, 238. *See* United States v. Crumpton, 824 F.3d

593, 608 (6th Cir. 2016) ("the fact that Crumpton was put outside in the cold certainly plays into the totality-of-circumstances analysis, but it is a single factor that is outweighed by other factors").

      Notwithstanding the circumstances of Fox's initial encounter with law enforcement, there is no evidence that SA Calleri employed any coercive tactics in later questioning him inside the residence. *See* United States v. Amry, 2003 WL 124678, *4 (S.D.N.Y. 2003) (the defendant gave voluntary consent to search because "[w]hile an early morning arrest in a home would be a shocking and difficult experience for almost anyone, according to [the defendant]'s own description of the events, once he was taken into custody he and his family were treated appropriately"); United States v. Gaddy, 2006 WL 8422865, *5 (S.D. Iowa 2006), aff'd, 532 F.3d 783 (8th Cir. 2008) ("[t]he early morning hour and the number of officers are characteristics of the initial entry, which occurred around one hour before the interrogation. The circumstances of the interview that produced the statements and the characteristics of the defendant must also be considered in determining whether a confession was voluntary or the result of undue coercion"). Their conversation occurred in the familiar surroundings of Fox's home without any threats or promises. [123] at 92-93, 238-39, 245. Questions of Fox were asked in a "[v]ery calm and polite" manner, and Fox remained "very calm and cool, collected". Id. at 239.

      Nor was Fox unduly susceptible to coercion. There is no evidence that he was under the influence of alcohol or drugs. [123] at 94, 180. He is also a well-educated professional ([104-1] at 44-48), who acknowledged at oral argument that he had a criminal justice degree, and

had at least one prior interaction with law enforcement from a 2017 Driving While Intoxicated

charge. Id. at 50-51. Therefore, I recommend that this motion be denied.[7]


**2.    Suppression of Statements at the LPD**

Fox argues that the Miranda waivers he executed prior to his interrogation and

polygraph examination were involuntary due to coercive police activity. "When a defendant

contests the voluntariness of a Miranda waiver, the Government bears the burden of establishing,

by a preponderance of the evidence, that the waiver was valid." United States v. Hamilton, 487

F. Supp. 3d 140, 147 (E.D.N.Y. 2020).

While Fox argues that he was "chilled to the bone" when he arrived at the LPD

(Fox's Memorandum of Law [94-1] at 28; Fox's Declaration [95], ¶8") the video recording of

the interview does not give any indication - either in his statements or appearance - that he was

cold, much less that his will was overborne. See United States v. Copeland, 2020 WL 2502423,

*4 (N.D. Ga.), adopted, 2020 WL 1131026 (N.D. Ga. 2020) ("[a]lthough Copeland relies on the

cold weather at the time of the interview to support his contention that his waiver was not

voluntary, the record contains no evidence that he ever complained about being cold or requested

that the interview be moved to a warmer location").  In fact, as the government notes ([104] at

37), Fox tellingly acknowledged during the interview that compared to earlier that morning, he

was "pretty darn comfortable". [104], manually filed disc at 7:27:30.

---

[7]      Based on this recommendation, it is not necessary for me to address the government's alternative
reliance on the inevitable discovery doctrine ([104] at 38-41) and argument that the costs of applying the
exclusionary rule would outweigh the benefits. Id. at 41-43 (citing Herring v. United States, 555 U.S. 135,
142 (2009) and United States v. Julius, 610 F.3d 60, 66 (2d Cir. 2010)).

Moreover, during his interview Fox declined SA Weiss's request for him to sign a consent to search his cell phone ([104], manually filed disc at 7:40:00) and resisted the agents' attempt to question him about his sexual activities (id. at 7:47:50), further undermining his claim that his will was overborne. By retaining sufficient free will to refuse law enforcement's request to search and attempts to question him on certain topics, Fox cannot credibly claim that his Miranda waiver or any of his statements were involuntary. *See* United States v. Iverson, 166 F. Supp. 3d 350, 362 (W.D.N.Y. 2016), aff'd, 897 F.3d 450 (2d Cir. 2018) ("Iverson's will certainly was not overborne: he continued to refuse his consent when officers asked him to search his apartment").  Therefore, I recommend that this motion be denied.


### 3.     Suppression of Evidence from the February 2, 2022 Search Warrant

The Fourth Amendment states that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "Probable cause is not a high bar." District of Columbia v. Wesby, 583 U.S. 48, 57 (2018).  In determining the existence of probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

"A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." United

States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993).  However, that deference "is not boundless . . . . [R]eviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." United States v. Leon, 468 U.S. 897, 914-15 (1984).

The February 2, 2022 search warrant authorized law enforcement to search and seize evidence related to violations of, *inter alia*, 18 U.S.C. §1591(a) (sex trafficking by means of force, threats, fraud, or coercion) and 21 U.S.C. §841(a)(1) (possession of controlled substances with intent to distribute). Calleri Affidavit [94-2], ¶¶1, 45.  SA Calleri's supporting Affidavit centered on the reports of two victims (Victims 1 and 2), each of whom were alleged prostitutes. Id., ¶¶6, 18.  Allegedly, Fox initially paid cash to these individuals for sex, but then provided them with drugs as payment and performed non-consensual sex acts on them. Id., ¶¶8, 9, 20, 26. Fox's alleged in person contact with Victim 2 spanned from approximately November 2018 through June or July of 2021 (id., ¶18), and toll records showed that Fox remained in telephone contact with other suspected prostitutes through December 2021. Id., ¶31.

Fox argues that probable cause for the search warrant was lacking because SA Calleri's Affidavit established that he "would not have drugs in his residence unless he was patronizing 1 specific prostitute on a regular basis", but despite the two months of surveillance that preceded the search, nothing in SA Calleri's Affidavit suggested that "there is/was a prostitute at the residence". Fox's Memorandum of Law [94-1] at 35-36.

Even if probable cause was lacking to believe that controlled substances were located in the residence, probable cause existed to believe that other evidence of Fox's alleged crimes would remain.  SA Calleri's Affidavit established probable cause to believe that the

alleged conduct may have been ongoing up until several months earlier, and that electronic evidence was created in connection with the alleged crimes. *See* Calleri Affidavit [94-2], ¶¶31, 34-36.  For instance, there was information that Fox had surveillance cameras throughout the residence that were synced to his cell phone and used to monitor the prostitutes, that he would respond to online posts for prostitutes and communicate with them on his cell phone, and that he took photographs of the prostitutes. Id., ¶¶6, 10-11, 21- 22, 28-31.

Based on this information, SA Calleri reasonably opined that Fox's electronic devices would "likely . . .  contain evidence of [him] visiting sex-trafficking websites, communicating with prostitutes, communicating with drug traffickers, and may also contain recordings of Fox engaging in commercial sex acts with Victim 1, Victim 2, and others". Id., ¶36.  *See* United States v. Langston, 2023 WL 4935984, *10 (D. Conn. 2023) ("most people maintain possession of their cell phones for extended periods of time - certainly longer than the two to three months at issue here. Further, cell phones can store information for months or even years. And, in the modern world of 'cloud' technology, many cell phones, even when replaced, will nevertheless contain or have the capacity to access information that was stored on previous devices").

Fox also argues that "there is no behavior . . . described in the application that constitutes him being a drug or sex trafficker". Fox's Memorandum of Law [94-1] at 36.  This argument is belied by SA Calleri's Affidavit, which stated that while Victim 1 did not believe that Fox used heroin or crack cocaine, he maintained "baseball size bags" of these controlled substances and would "buy drugs often and buy large quantities". Calleri Affidavit [94-2], ¶8, 20 (Victim 2 also described Fox buying "large quantities of drugs").  Likewise, her Affidavit

established ample probable cause that Fox was a sex trafficker - *i.e.*, did knowingly patronize and solicit, by any means, in and affecting interstate commerce, persons, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and any combination of such means, would be used to cause them to engage in a commercial sex act. *See* 18 U.S.C. §1591(a).

Finally, Fox argues that the application did not "corroborate the alleged victim's information except for the fact that the defendant lives at [the premises]", and that it erroneously equated Fox's use of video surveillance with him being a drug and sex trafficker "to get the search warrant". Fox's Memorandum of Law [94-1] at 36.  These arguments are also belied by SA Calleri's Affidavit, which demonstrates that the accounts of Victims 1 and 2 and other evidence - not merely Fox's use of surveillance cameras - established probable cause for the search.  Likewise, the information provided by Victims 1 and 2 was corroborated by a variety of means other than their knowledge of Fox's address. This included telephone and police records, as well as the consistency between their independent accounts.

In reply, Fox argues that the information in the warrant was stale. There is "no bright-line rule for staleness." United States v. Raymonda, 780 F.3d 105, 114 (2d Cir. 2015). Instead, staleness "must be evaluated on the basis of the facts of each case," with the "two critical factors" being "the age of the facts alleged and the nature of the conduct alleged to have violated the law." Id.  Moreover, when there is a "pattern of continuing criminal activity, such that there is reason to believe that the cited activity was probably not a one-time occurrence, the passage of time between the last alleged event and the warrant application is less significant." Id.

As discussed above, SA Calleri's Affidavit offered a sufficient basis to conclude that Fox's criminal activities had been ongoing since late 2018/early 2019 to at least June or July of 2021, when he last saw Victim 2 in person. Calleri Affidavit [94-2], ¶¶6, 18. Although there was no direct evidence that Fox continued to frequent prostitutes and undertake the same conduct as he did with Victims 1 and 2, toll records showed that he contacted other suspected prostitutes a number of times through December 2021. Id. at ¶¶30-31.  Under these circumstances, the February 2, 2022 search warrant, which came several months later, was not stale. See United States v. Mathis, 2018 WL 4473529, *13 (D. Minn.), adopted, 2018 WL 4062741 (D. Minn. 2018) (the search warrant was not stale where "[t]he lapse of time between the trafficking of [the victim] and the issuance of the . . .  search warrants was less than a year").

Next, Fox argues that probable cause was lacking to search both until units of the duplex. Fox's Reply [105] at 4.  "[P]robable cause must be shown for searching each [apartment] unless it be shown that, although appearing to be a building of several apartments, the entire building is actually being used as a single unit." United States v. Hinton, 219 F.2d 324, 326 (7th Cir. 1955). Here, however, there was sufficient evidence that Fox exerted sufficient control and had ready access to the adjacent unoccupied unit. See United States v. Arguelles, 2012 WL 4513781, *3 (E.D. 2012) ("[i]nformation that Defendant had control over and used both units provides probable cause to search the entire dwelling").  In particular, both Victims 1 and 2 reported that there was a hole cut in the bedroom closet, where he stored his drugs, to allow him to access the adjacent unit. Calleri Affidavit [94-2], ¶¶8, 20, 23.  Utility records also revealed that the natural gas service for both units was subscribed to by Fox. Id. at ¶33.

-20-

Finally, Fox argues that Potential Victims 3-5 (Calleri Affidavit [94-2], ¶¶28-31) could have been contacted and interviewed. Fox's Reply [105] at 3-4.  While that may be so, "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Allen, 211 F.3d 970, 975 (6th Cir. 2000).

In any event, even if probable cause was lacking, I agree with the government that the evidence obtained from the search warrant would still be admissible under the good faith exception of Leon, supra. *See* Government's [104] at 51-52.  "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated search warrant." Herring, 555 U.S. at 142.

"The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011). There are "four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." Id.

The warrant here was not so facially deficient or so lacking in probable cause that reliance upon it would have been objectively unreasonable. Nor, for the reasons that are set forth below, do I believe that Judge Roemer was misled in any fashion or that he abandoned his judicial role.  Therefore, even if the search warrant was determined to be unsupported by

probable cause, I would conclude that the good faith exception applies, and recommend that this motion be denied.

4.      **<u>Franks</u> Hearing**

I previously held that Fox had not demonstrated his entitlement to a <u>Franks</u> hearing. *See* March 14, 2023 Text Order [107].  The following discussion memorializes the basis for this conclusion in greater detail. A <u>Franks</u> hearing permits a defendant "to challenge the veracity of a search warrant . . . where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information". <u>United States v. Canfield</u>, 212 F.3d 713, 717 (2d Cir. 2000).  The standard for establishing an entitlement to a <u>Franks</u> hearing is a "high one". <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991).  A defendant must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding." <u>United States v. Levasseur</u>, 816 F.2d 37, 43 (2d Cir. 1987).

Fox's motion for a <u>Franks</u> hearing focuses on two background paragraphs contained in SA Calleri's Affidavit which describe an investigation into Larion Graham, a sex trafficker. Calleri Affidavit [94-2], ¶¶4, 5. In the course of that investigation, Victim 1 was interviewed and provided information that she was forced to engage in commercial sex acts by Graham, who beat and raped her, and that Fox became a frequent client of hers after he responded to an online escort advertisement posted by Graham. <u>Id</u>., ¶6.

Noting that "there is a very significant difference" between him and Graham, who is "accused of raping and beating the victim, giving her drugs and advertising her for prostitution", Fox argues that there was "no other reason" for SA Calleri to "bring[ ] up Graham in the . . . search warrant application other than to mislead the Judge". Fox's Memorandum of Law [94-1] at 37.  He argues that "[w]ithout the information regarding [Graham's] conduct and investigation, [his] conduct would appear nothing more than a middle aged man patronizing drug addicted prostitutes with an affliction for BDSM [bondage and discipline, dominance and submission, sadism and masochism]".

I disagree. There is no claim that any information was withheld or falsified, nor is there any basis to conclude that Judge Roemer was misled.  A plain reading of SA Calleri's Affidavit demonstrates that none of the information about Graham, which was confined to only two of the 47 paragraphs of SA Calleri's Affidavit, was "submitted to offer anything other than context into how the investigation into Fox began". Government's Response [104] at 49.

In any event, even if the statements about Graham were misleading and excised from SA Calleri's Affidavit, Fox has failed to establish that they were material to the probable cause determination.  Contrary to Fox, SA Calleri's Affidavit, which alleged that Fox raped women and purchased large quantities of controlled substances, demonstrates that his alleged conduct far transcended patronizing prostitutes. Therefore, I recommend that his motion for a <u>Franks</u> hearing be denied.

**B.      The Government's Cross-Motion for Reciprocal Discovery**

The government cross-moves for the production of reciprocal discovery pursuant to Rule 16(b). Government's Response [104] at 53. "Rule 16 . . . imposes reciprocal discovery obligations on defendants." United States v. Smith, 985 F.Supp.2d 506, 522 (S.D.N.Y. 2013). Fox has not opposed this request.  Therefore, it is granted.

The government also asks that "upon the District Court's setting a trial date and accompanying Scheduling Order . . . the defendant provide a summary of any testimony that the defendant intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence". Government's Response [171] at 37.  Since Fox has also not opposed this request, it is granted.

## CONCLUSION

For these reasons, the government's cross-motion (Government's Response [104] at 53) is granted, and I recommend that Fox's motions to suppress and for a Franks hearing (Fox's Memorandum of Law [94-2], §§VI and VII) be denied.

Unless otherwise ordered by Judge Sinatra, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by September 29, 2023. Any requests for extension of this deadline must be made to Judge Sinatra.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal</u> <u>Wholesale Electric Co.,</u> 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: September 15, 2023

<u>/s/Jeremiah J. McCarthy</u>
JEREMIAH J. MCCARTHY
United States Magistrate Judge